# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

\* \* \*

JESSICA LYNN TKACZ,
    Plaintiff,

v.

ELAINE C. DUKE, *et al*.,
    Defendants.

Case No. 2:14-cv-00092-RFB-CWH

**ORDER**

Motions for Summary Judgment (ECF Nos. 49 and 50)

## I. INTRODUCTION

Before the Court is Plaintiff's Second Motion for Summary Judgment (ECF No. 49) and Defendants' Second Motion for Summary Judgment (ECF No. 50). For the reasons discussed below, Defendants' motion is granted and Plaintiff's motion is denied.

## II. PROCEDURAL BACKGROUND

Plaintiff filed a Complaint in this case on January 1, 2014. ECF No. 1. The case was initially assigned to Judge Robert C. Jones and Magistrate Judge Carl W. Hoffman. ECF No. 2. The case was reassigned to Judge Richard F. Boulware, II on August 12, 2014. ECF No. 13. Plaintiff filed a Motion for Summary Judgment on August 30, 2014. ECF No. 15. Defendants filed a Cross Motion for Summary Judgment on September 16, 2015. ECF No. 17. Plaintiff filed a Motion to

Amend/Correct Complaint on October 6, 2014. ECF No. 21. At a hearing on September 23, 2015, the Court denied without prejudice the Motions for Summary Judgment (ECF Nos. 15 and 17) and ordered Plaintiff to file a Motion to Amend that complied with local rules by attaching the proposed Amended Complaint. Plaintiff filed the revised Motion to Amend on October 7, 2015, which was granted at a hearing on December 16, 2015. ECF Nos. 31, 36. The Amended Complaint was filed on December 21, 2015. ECF No. 37. Defendants filed an Answer to the Amended Complaint on February 16, 2016. ECF No. 40. Defendants filed a Motion to Dismiss for Lack of Prosecution on January 27, 2017. ECF No. 43. On June 23, 2017, the Court held a hearing in which it denied the Motion to Dismiss for Lack of Prosecution and ordered that dispositive motions were due by August 25, 2017. ECF No. 48. Plaintiff and Defendants filed the instant Second Motions for Summary Judgment on August 25, 2017. ECF Nos. 49, 50.

### III. LEGAL STANDARD

In deciding a motion for summary judgment challenging a final agency action, the function of the reviewing court is to determine whether, as a matter of law, the evidence in the administrative record permitted the agency to make the decision it did. Occidental Engineering Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985). The standard of review set forth in Fed. R. Civ. P. 56 is not applicable, but instead, the entire case on review under the Administrative Procedure Act (APA) is a question of law. Id. at 770. Summary judgment involving review of agency action does not require fact-finding by the district court. Rather, the court's review is limited to the administrative record. Northwest Motorcycle Ass'n. v. Dep't of Agriculture, 18 F.3d 1468, 1472 (9th Cir. 1994).

Under the APA, a Court may only hold unlawful and set aside an agency action that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, 273 F.3d 1229, 1236 (9th Cir. 2001). "Agency action should be overturned only when the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise." Safari Aviation Inc. v. Garvey, 300 F.3d 1144, 1150 (9th Cir. 2002) (internal citations and quotations omitted). Although a court's review under the APA should be "searching and careful," it is not *de novo*. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989). A district court may not substitute its judgment for that of the agency. Id.

An agency's factual findings are reviewed under the substantial evidence standard. Ramos-Vasquez v. INS, 57 F.3d 857, 861 (9th Cir. 1995). "Substantial evidence constitutes more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. If the evidence is susceptible of more than one rational interpretation, we must uphold [the agency's] findings." Bear Lake Watch, Inc. v. FERC, 324 F.3d 1071, 1076 (9th Cir. 2003) (internal citations omitted).

**IV.  BACKGROUND**

The following facts are taken from the administrative record in this case.

### A. Ferreira-Pedrosa Marriage

Plaintiff's husband and the intended beneficiary of her I-130 petition, Alayne Ferreira, married his first wife, Irsa Pedrosa, on June 8, 2007 in Orlando, Florida. On June 25, 2007, Pedrosa signed an I-130 Petition on Ferreira's behalf, which was filed on July 30, 2007 along with Ferreira's I-485 Application. On June 9, 2008, Ferreira and Pedrosa appeared for a United States Citizenship and Immigration Services (USCIS) interview regarding their marriage, where they both claimed, under oath, that they were residing together in a bona fide marital relationship.

On September 27, 2008, two USCIS Officers, Carol Lazaro and Ilene Valenzuela, conducted an unannounced site visit at the address on file for Ferreira and Pedrosa. The fraud verification memorandum created by Officer Lazaro is the only record of this event and provides the following information: Plaintiff Tkacz answered the door and told the officers she was living there as a roommate, and that Pedrosa and Ferreira were at work. Officer Lazaro then called Ferreira's cellular telephone number. Ferreira answered and told Officer Lazaro that he and his wife are the

only residents at the address, and that his wife was at home that day. Officer Lazaro then explained to Ferreira that she knew Plaintiff was living at his home and that Pedrosa was not living in Las Vegas. Shortly after the phone call, Ferreira arrived at his house and spoke with the officers in person. The memorandum summarizes the interaction between Ferreira and the officers:

> When Mr. FERREIRA arrived home, he invited myself and officer Valenzuela into his home. Jessica [Tkacz] did not seem pleased with our presence and went upstairs. Mr. FERREIRA, SIO Valenzuela and myself all sat down at the kitchen table to talk. Mr. FERREIRA was able to provide a current telephone number for Irsa PEDROSA, which was [], but was unaware of her current address, although he stated he believed she was either living in Florida or Puerto Rico. He stated Irsa PEDROSA had come to Las Vegas for the interview and then left town. He stated he just wanted to make a life in the United States and that Irsa had married him to help him. Mr. FERREIRA stated that about two months after filing the Form I-485, Application for Adjustment of Status, He met his current girlfriend Jessica TKACZ. They have been in a relationship ever since. At one point Jessica had become pregnant but had lost the baby.

On March 26, 2009, USCIS issued Ferreira and Pedrosa a Notice of Intent to Deny (NOID) their I-130 petition. A copy of the NOID was sent to Pedrosa's last known address, which was returned as "undeliverable," and to her attorney of record, John Doechung Lee. USCIS did not receive a response to the NOID and denied the I-130 petition on May 26, 2009.

Ferreira divorced Pedrosa on March 24, 2009 and married Plaintiff on May 8, 2009.

### B. Tkacz-Ferreira I-130 Proceedings

Plaintiff filed an I-130 petition for Ferreira on July 23, 2010 and they appeared for an interview with USCIS on May 13, 2011. The interview was video recorded. At that interview, the USCIS Officer asked Ferreira if he had previously had an I-130 petition filed on his behalf and if he withdrew that petition, to which Ferreira responded yes. The Officer continued, "And according to the investigators, you withdrew that after admitting that you entered into the marriage for the sole purpose of getting your green card." Ferreira denied making this admission. The Officer then stated, "Well the person you admitted it to is right across the hall, she's a supervisor. Let me go ask her." The Officer then reminded Ferreira that he was under oath and left the interview room for a few minutes, presumably to speak to the supervisor he had referred to. When he returned, the

Officer stated that they were all done for the day and he would send Ferreira something in the mail regarding his case. Ferreira's counsel asked where the supervisor was and said that she had accused Ferreira of something he did not do. The Officer responded that he had just asked the supervisor if she remembered Ferreira's case, to which Ferreira's counsel responded "yeah, that doesn't mean she was right. It doesn't mean he admitted that." The Officer then stated, "I'm taking [the supervisor's] word over his word, how's that?" Ferreira's counsel then stated that he would like to see the supervisor, at which point the Officer said in a raised voice, "so you're calling [the supervisor] a liar too?" Ferreira's counsel responded that he was not calling her a liar. Ferreira's counsel then stepped out of the interview room and had a conversation in private with the supervisor in question. While Ferreira's counsel was absent, the Officer told Ferreira that he had accused the supervisor of lying on a report, which was a very serious accusation and could send her to prison. He reiterated, "But I'm going to believe her – she's been here for 35 years." The Officer, Ferreira's counsel, and the supervisor then spoke in the hallway for a few minutes and the interview ended. The total interaction lasted less than 12 minutes.

After this interview, an NOID was issued based on an alleged sham marriage between Ferreira and his ex-wife, Pedrosa. A response was timely filed and USCIS denied the I-130 petition with a finding of INA §204(c) marriage fraud on August 11, 2011.

A timely appeal was filed with the Board of Immigration Appeals (BIA) by Plaintiff on September 8, 2011. After Plaintiff filed the appeal, USCIS requested a remand "back to the Director for issuance of a new Notice of Intent to Deny and to provide the petitioner with an opportunity to review and respond to 1) the beneficiary's statement and 2) the site visit report prepared by USCIS officers, both relating to the prior marriage."

The BIA remanded the case on May 24, 2012 to allow Plaintiff to review and respond to Ferreira's statement and the site visit report prepared by USCIS officers related to the unannounced site visit on September 27, 2008. A subsequent USCIS interview was held on August 30, 2012. This interview was also video recorded. A different USCIS Officer interviewed the couple on that occasion, speaking to them both together and separately. The Officer also took a sworn written statement from Ferreira, which was witnessed and which Ferreira signed. This interview was much

more detailed than the first interview and lasted over an hour and a half. In this interview, Ferreira denied remembering ever making the statement recorded in the USCIS memorandum that he just wanted to make a new life for himself in the U.S. and that Pedrosa had married him to help him. Ferreira's counsel was also present at this interview and clarified that Ferreira understood the question, saying that the statement could be interpreted many ways and asking Ferreira if he said anything at all similar to what the USCIS Officer recorded in the memorandum. Ferreira reiterated that he did not recall saying anything of that kind. It is unclear from the record whether the petitioner ever requested that either of the USCIS Officers who conducted the unsupervised site visit on September 27, 2008 be made available for cross-examination during the second interview. Neither Ferreira nor his counsel commented on their absence during the video recording of the interview.

After this interview, USCIS issued another NOID dated October 2, 2012. A timely response was filed on November 1, 2012. A Denial Notice was issued again on December 7, 2012. A timely appeal was filed on January 4, 2013. Counsel for the Plaintiff submitted a brief within 30 days and the file was forwarded to the BIA. The BIA denied relief on December 20, 2013. This decision is the final agency action in this case. In it, the BIA explained its reasoning as follows:

> Based on the fact that the beneficiary became romantically involved with the petitioner shortly after he married Ms. Pedrosa, and his admission that he falsely testified that he was in a valid and bona fide marriage with Ms. Pedrosa in June 2008, we find substantial and probative evidence supporting the application of the fraudulent marriage bar in section 204(c) of the Act…We note that Ms. Pedrosa, who also provided false testimony during their interview, has not submitted a statement confirming that their marriage was bona fide. Moreover, there is no persuasive evidence that Ms. Pedrosa and the beneficiary ever lived together. Because we agree that the beneficiary is precluded from obtaining an approved visa petition under the provisions of section 204(c) of the Act, we need not address the remaining arguments on appeal.

Plaintiff then filed the Complaint in this case on January 1, 2014. Plaintiff alleges that USCIS's conclusion that the beneficiary, Ferreira, previously committed marriage fraud is arbitrary and capricious, not supported by relevant statute or regulation, and constitutes unlawful failure or

refusal to exercise discretion, in violation of §701 and §706 of the APA. The Amended Complaint adds a claim for violation of Plaintiff's Fifth Amendment Due Process rights.

## V. DISCUSSION

### A. Due Process
#### 1. *Legal Standard*

The Due Process Clause of the Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." Wedges/Ledges of Cal., Inc. v. City of Phoenix, 24 F.3d 56, 62 (9th Cir. 1994). The Ninth Circuit has held that petitions for immediate relative status are protected by due process because "grant of an I-130 petition for immediate relative status is a nondiscretionary decision. Immediate relative status for an alien spouse is a right to which citizen applicants are entitled as long as the petitioner and spouse beneficiary meet the statutory and regulatory requirements for eligibility." Ching v. Mayorkas, 725 F.3d 1149, 1156 (9th Cir. 2013).

In analyzing due process claims in the immigration context, the question of how much process is due is case-specific. Courts apply the Matthews factors to the specific facts of the case at hand:
> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

In Ching, the Ninth Circuit reversed a grant of summary judgment where the plaintiffs argued that "the denial of [the alien spouse's] I-130 visa petition violated their Fifth Amendment Due Process rights because they were not afforded the opportunity to cross examine [the alien spouse's] first husband, Elden Fong, or the USCIS officer who took Fong's statement." Ching, 725 F.3d at 1154-55. In that case, the BIA had relied primarily on a written statement made by the ex-husband of the alien spouse, stating that he had been paid to marry the alien spouse in a sham

marriage. The BIA did not make the ex-husband or the agent who interviewed him available to the petitioner for cross-examination. Id. at 1153. The Ninth Circuit reversed and remanded with instructions to remand to the agency so that the agency could hold an evidentiary hearing. Id. at 1159.

In evaluating the Matthews factors, the Ching Court noted that the first factor favored the plaintiffs because "[t]he right to live with and not be separated from one's immediate family is 'a right that ranks high among the interests of the individual' and that cannot be taken away without procedural due process." Id. at 1157 (citing Landon v. Plasencia, 459 U.S. 21, 34-35 (1982)). As to the second factor, the Court explained that the risk of erroneous deprivation was especially high where the witness (an ex-spouse) may have been motivated by malice and where the plaintiffs had presented substantial evidence that the marriage was not a fraud, including descriptive details of their life together and documentary evidence, including bills and a lease. Id. at 1158. The Ninth Circuit cited to the Supreme Court for the principle that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." Goldberg v. Kelly, 397 U.S. 254, 269 (1970). As to the third factor, the Ching Court noted that, although the government has a substantial interest in preventing those who commit marriage fraud from erroneously receiving benefits, "there is a significant public interest in allowing those who are legitimately married to receive the benefits intended for them." Ching, 725 F.3d at 1158-59. The Court found that "[t]he additional procedures would entail the minimal cost to the government of holding an additional hearing in this case" and "because the process sought by Plaintiffs is guaranteed to aliens in removal proceedings, there are no practical problems with such a requirement." Id. at 1159.

In a recent unpublished decision, the Ninth Circuit found that application of the marriage fraud prohibition was not arbitrary and capricious based on the following evidence:

> Alabed and Murillo submitted very little documentation in support of their I-130 petition, and Alabed and Murillo gave inconsistent answers to certain questions during their interviews. When Murillo was confronted with these inconsistencies, she admitted the marriage was fraudulent and provided USCIS with a sworn statement attesting that Alabed had paid her to enter into the marriage. Moreover, USCIS obtained a police report in which Alabed mentioned his girlfriend, Gina Botello. Botello provided a sworn statement to USCIS indicating that she had been

> in a romantic relationship with Alabed since June 1998, prior to Alabed's marriage to Murillo. The romantic relationship between Alabed and Botello was confirmed by PG&E records showing that the two lived together from 1999 until 2000. This was substantial and probative evidence of marriage fraud. Alabed v. Crawford, 691 Fed. Appx. 430, 431 (9th Cir. 2017).

The Court also held that the plaintiffs "did not have a due process right to cross-examine Botello, Murillo, or the USCIS officers who interviewed Botello and Murillo." Id. at 432. The Court found that a case-specific analysis of the Matthews factors led to a different outcome than that in Ching because: (1) USCIS relied on objective evidence other than the witness statements in making its marriage fraud determination, (2) Plaintiffs' rebuttal evidence was less compelling, and (3) Plaintiffs "had access to and submitted declarations from the very witnesses they wish to cross-examine," making it unlikely that cross-examination would significantly reduce the risk of erroneous deprivation. Id. Although not binding on this Court, Alabed demonstrates that due process can be satisfied in the immigration context even where petitioners are not given the opportunity to cross-examine key witnesses.

### *2. Discussion*

Although the requirements of due process may not have been met in Tkacz and Ferreira's first USCIS interview, the Court finds that the requirements of due process were satisfied through the petitioner's second interview and subsequent appeal. The Court notes that the couple's first interview was very brief, they were not given the inculpatory USCIS memorandum in advance, they were not allowed to explain the context of the damaging statement, and the USCIS Officer appears to have based his determination upon a single witness statement without making the witness available for cross-examination. Had the BIA not remanded the case for a second interview, it would be more difficult to say that due process was satisfied here. USCIS requested a remand, however, specifically so that the couple could have the opportunity to review and respond to the USCIS memorandum and Ferreira's prior statement regarding his marriage to Pedrosa. It is unclear from the record and from Plaintiffs' motions whether the couple requested that either of the USCIS Officers who conducted the September 27, 2008 site visit be made available for cross-examination at the second USCIS interview. In Plaintiff's Motion for Summary

Judgment, she complains that "[t]he two alleged sworn officers who made reports did not present them at the May 13, 2011 hearing." ECF No. 49 at 15. The motion does not mention USCIS refusing to produce the officers for the second interview on August 30, 2012, however, and the record does not indicate that such a request was ever made. Plaintiff acknowledges that she was given a copy of the USCIS memorandum that formed the primary basis for the finding of marriage fraud on August 12, 2011, more than a year before the second interview. It is clear from the video recording of the first interview that Plaintiff was aware of the identity of at least one of the USCIS Officers and Plaintiff's counsel spoke to her in person. Plaintiff had sufficient time and notice to prepare for the second interview and request the presence of the USCIS Officers if she desired to do so.

Even if Plaintiff did request and was denied the opportunity to cross-examine the officers at the second USCIS interview, the Court finds that due process was still satisfied in this case. Applying the Matthews factors, the first factor weighs in Plaintiff's favor because the interest at stake here is highly significant. Landon, 459 U.S. at 34-35. The second factor is more equivocal, however. In determining marriage fraud, the Court must look to the parties' intent at the inception of the marriage. United States v. Orellana-Blanco, 294 F.3d 1143, 1151 (9th Cir. 2002). Ferreira's statement to USCIS during the unannounced site visit is the only evidence in this case that is directly probative on that issue, making it highly significant. On the other hand, it is unclear what could be gained from cross-examination. Plaintiff argues that Ferreira's English skills are faulty at times and that his statement "does not mean he entered the marriage fraudulently and only for an immigration benefit. In fact, the statement means [Pedrosa] helped him after they had already broken up which is what happened." ECF No. 49 at 20. This is not what Ferreira testified to in the second USCIS interview though. When asked about this statement, Ferreira flatly denied ever saying anything of the kind to the USCIS Officers. If this was a more nuanced situation, for example if Ferreira testified that the Officers took his words out of context or that the language barrier caused them to misinterpret him, cross-examination might be helpful to get a fuller factual background. But this case involves a direct credibility determination regarding whether Ferreira made the statement or not, leaving less to gain from live testimony. Plaintiff has not alleged that

either of the Officers had a personal bias against Ferreira or Tkacz or any motive to lie. The Court does not find that cross-examination would significantly decrease the risk of erroneous deprivation under these circumstances. As to the third factor, holding another evidentiary hearing in this case would not be unduly burdensome, but the Court notes that USCIS already held a second hearing in which the parties discussed the facts of this case in considerable detail and it is unclear what new information Plaintiff expects cross-examination of the USCIS Officers to reveal. The Court finds that Plaintiff is not entitled to cross-examination under the facts of this case and that due process was satisfied through the second USCIS interview and subsequent appeal.

### B. APA Review of the Finding of Marriage Fraud

Having determined that the administrative procedures followed in this case did not violate Plaintiff's due process rights, the Court turns to the question of whether the BIA's decision was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law, in violation of the APA.

#### *1. Legal Standard*

A petition for immediate relative status must be denied if "(1) the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence, by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws, or (2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws." 8 U.S.C. § 1154(c). Under INA regulations, the USCIS is to "deny a petition for immigrant visa classification filed on behalf of any alien for whom there is substantial and probative evidence of such an attempt or conspiracy, regardless of whether that alien received a benefit through the attempt or conspiracy." 8 C.F.R. § 204.2 (a)(1)(ii). Known as the "fraudulent marriage prohibition," this provision also states, "Although it is not necessary that the alien have been convicted of, or even prosecuted for, the attempt or conspiracy, the evidence of the attempt or conspiracy must be contained in the alien's file." Id. In general, when a prior marriage fraud

finding is used to deny a subsequent alien relative petition, the reviewing body cannot rely solely on the prior finding but must consider *de novo* the evidence in the record. Matter of Tawfik, 20 I. & N. Dec. 166, 168 (BIA 1990). In determining whether or not the beneficiary has previously engaged in marriage fraud, "the district director may rely on any relevant evidence, including evidence having its origin in prior Service proceedings involving the beneficiary, or in court proceedings involving the prior marriage." Id. If USCIS finds that a visa petition should be denied based on the marriage fraud prohibition and substantial and probative evidence supports that finding, the petitioner bears the burden of rebutting the finding and showing that the prior marriage was bona fide. See Matter of Tawfik, 20 I. & N. Dec. at 167; Matter of Kahy, 19 I. & N. Dec. 803, 806-07 (BIA 1988); 8 C.F.R. § 204.2(a)(1)(ii).

The relevant question in deciding whether the fraudulent marriage prohibition applies is whether "the bride and groom did not intend to establish a life together at the time they were married." Orellana-Blanco, 294 F.3d at 1151 (citing Bark v. Immigration & Naturalization Service, 511 F.2d 1200, 1201 (9th Cir. 1975)). "Conduct of the parties after marriage is relevant only to the extent that it bears upon their subjective state of mind at the time they were married…Evidence that the parties separated after their wedding is relevant in ascertaining whether they intended to establish a life together when they exchanged marriage vows. But evidence of separation, standing alone, cannot support a finding that a marriage was not bona fide when it was entered." Bark, 511 F.2d at 1202. Evidence of intent may take many forms, including, but not limited to, proof that the beneficiary has been listed as the petitioner's spouse on insurance policies, property leases, income tax forms, or bank accounts, and testimony or other evidence regarding courtship, wedding ceremony, cohabitation, and shared experiences. Matter of Laureano, 19 I & N Dec. 1, 3 (BIA 1983).

A marriage is not necessarily fraudulent simply because obtaining citizenship was one motive behind it. "Just as marriages for money, hardly a novelty, or marriages among princes and princesses for reasons of state may be genuine and not sham marriages, so may marriages for green cards be genuine. An intent to obtain something other than or in addition to love and companionship from that life does not make a marriage a sham. Rather, the sham arises from the

intent not 'to establish a life together.'" Orellana-Blanco, 294 F.3d at 1151 (internal citations omitted). Courts also must be careful not to project preconceived notions of what a bona fide marriage looks like onto petitioners. "The concept of establishing a life as marital partners contains no federal dictate about the kind of life that the partners may choose to lead. Any attempt to regulate their life styles, such as prescribing the amount of time they must spend together, or designating the manner in which either partner elects to spend his or her time, in the guise of specifying the requirements of bona fide marriage would raise serious constitutional questions…Aliens cannot be required to have more conventional or more successful marriages than citizens." Bark, 511 F.2d at 1201-02.

### *2. Discussion*

The Court does not find that the BIA's application of the marriage fraud prohibition in this case was arbitrary, capricious, an abuse of discretion or otherwise contrary to law. Upon reviewing the evidence in the administrative record, the Court does not find that USCIS "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Safari Aviation Inc., 300 F.3d at 1150 (internal citations and quotations omitted).

First, USCIS provided substantial and probative evidence of a fraudulent marriage in this case. Most importantly, it had the memorandum and statement from the September 27, 2008 site visit, which it had to weigh against Ferreira's testimony that he never said Pedrosa married him to help him start a new life in the United States. As Ferreira admitted that both he and Pedrosa lied under oath at his USCIS interview in June 2008, USCIS was not irrational in assigning very little weight to his testimony. That admission itself – that Ferreira and Pedrosa were not living together as husband and wife less than a year after marrying and that they were willing to lie about this fact under oath – was evidence that their marriage was potentially fraudulent from its inception. Finally, USCIS had the fact that Ferreira began a romantic relationship with Tkacz just a few months after he married Pedrosa. Although this fact alone is insufficient to establish marriage

fraud, Bark, 511 F.2d at 1202, combined with the other circumstantial evidence in this case, it calls into question whether Ferreira and Pedrosa intended to establish a life together at the time they married.

Second, having found that USCIS provided substantial and probative evidence that Ferreira engaged in marriage fraud, the burden shifted to Plaintiff to establish that the marriage was bona fide and rebut the evidence of fraud. Alabed, Fed. Appx. 430 at 431 (citing In re Kahy, 19 I & N at 806-807). The Court notes that Ferreira provided a plausible explanation for his relationship history, which the BIA did not engage with in its decision. He testified in his second USCIS interview that he dated Pedrosa for over a year before they married and that the couple lived together in Las Vegas for approximately four months. At this point, he testified that Pedrosa had to return to Florida to care for her ill mother and the distance put a strain on their relationship. It was while Pedrosa was gone that Ferreira met Tkacz and the pair soon became romantically involved. Ferreira stated that he then made the misguided decision to continue in his immigration proceedings with Pedrosa, even though the couple was already separated at that point. This may very well be what happened in this case. The problem is that the only evidence Ferreira submitted to support this explanation was his own testimony and that of Tkacz, which USCIS understandably assigned very little credibility, given Ferreira's previous misrepresentations and the evidence that Tkacz was at least somewhat complicit in his marriage fraud.

Where the evidence in a case could support multiple plausible interpretations, the Court is not permitted to substitute its own judgment for that of the agency. Marsh, 490 U.S. at 378. Based on the significant circumstantial evidence that Ferreira's first marriage was fraudulent and Ferreira's failure to produce substantial objective evidence besides the testimony of himself and the Plaintiff in rebuttal, the Court does not find that the BIA's conclusion violated the APA.

### VI. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 50) is GRANTED.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (ECF No. 49) is DENIED.

The Clerk of Court is instructed to close this case.

DATED March 31st, 2018.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**